UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X

Eric Lachhman,                                    08-CV-04363
                              Petitioner,         (CPS)

        - against -
                                                  MEMORANDUM OPINION
Roseanna Lachhman,                                AND ORDER

                              Respondent.

---------------------------------------X

SIFTON, Senior Judge.

        Petitioner Eric Lachhman brings this petition against

respondent Roseanna Lachhman pursuant to the Convention on the

Civil Aspects of International Child Abduction, done at The Hague

on October 25, 1980 (the "Hague Convention"), T.I.A.S. No.

11,670, 19 I.L.M. 1501, see also Declaration of Kristina L.

Pieper dated October 27, 2008 ("Pieper Decl."), Exhibit ("Ex.") B

(copy of Hague Convention), as implemented in the United States

by the International Child Abduction Remedies Act ("ICARA"), 42

U.S.C. § 11601 et seq.  Presently before this Court is

petitioner's request for an order directing the return of his

daughter, C.L.[1] (the "child") to the country of her habitual

residence under the Hague Convention.  Upon the findings of fact

and conclusions of law set forth below, the request is granted.

---

[1] Pursuant to Federal Rule of Civil Procedure 5.2(a), the child's full
name and birth date are not included in this memorandum.

**BACKGROUND**

The following facts are derived from the petition and petitioner's affidavit submitted in connection with this action, as well as the evidentiary hearing held on November 12, 2008. Respondent has submitted no affidavit in connection with this matter and did not testify at the November 12, 2008 hearing.

Petitioner and respondent were married on June 20, 1999 in Guyana. Declaration of Eric Lachhman ("Lachhman Decl.") at ¶ 1; Marriage Certificate of Eric Lachhman and Roseanna Bacchus dated June 20, 1999, Petr's Hr'g Ex. 1. From August or September of 1999 until July of 2006, petitioner and respondent lived together at the same residence at 15A Craignish Avenue, London, England, which petitioner purchased approximately five years before meeting respondent. Lachhman Decl. ¶ 3. In 2003, the child was born to respondent and petitioner in Croydon, London, England. *Id.* ¶ 2; *see also id.* Ex. A (copy of child's redacted birth certificate).

On May 24, 2006, respondent filed for divorce. *Id.* ¶ 4. Petitioner states that his solicitors wrote to respondent's solicitors on several occasions concerning the divorce filing, but received no response. *Id.* To date, petitioner has received nothing beyond the divorce filing from either respondent or her lawyers, and I find and conclude that petitioner and respondent are still legally married. *Id.*

In July of 2006, petitioner and respondent agreed to separate, and petitioner moved out of 15A Craignish Avenue to live nearby with his parents in Camberwell, London. *Id.* ¶ 5. Respondent and the child continued to live at 15A Craignish Avenue until respondent took the child to the United States. *Id.* Respondent and petitioner agreed that the child would stay with petitioner on Saturdays and Sundays, and that petitioner could call the child throughout the week. *Id.* ¶ 6. Occasionally petitioner would pick up the child on Thursday evenings from her nursery school and return her to respondent on Sunday evening.

Petitioner states and I find that in England, the child was surrounded by family, including her paternal grandparents, an aunt and uncle, and two cousins, with whom she is close. *Id.* at ¶ 7. The child remains registered with her local general practitioner and health care providers in London, and still has a place in her nursery school program there. *Id.; see also id.* Ex. B (letter dated March 13, 2007 from doctor in Surrey, United Kingdom confirming that child is doctor's patient); *id.* Ex. C (letter dated February 26, 2007 confirming child's participation in nursery program in Norbury, United Kingdom since January 3, 2006, and noting date of last attendance as December 13, 2007).

Petitioner last saw and spoke to the child in the United Kingdom on October 22, 2006. *Id.* ¶ 8. After this date, respondent did not permit petitioner to pick the child up for her

weekend visit, and forebade petitioner from talking with the child on the phone. *Id.* Petitioner contacted his attorney to attempt to regain contact with the child, and petitioner's attorney wrote to respondent on three occasions, with no response. *Id.; see also id.* Ex. D (letters dated November 14, 2006, December 12, 2006, and January 22, 2007, from counsel for petitioner to counsel for respondent and respondent directly, regarding arrangements for child to visit petitioner).

On December 15, 2006, a neighbor at the Craignish Avenue apartment informed petitioner that respondent had taken the child to the United States, and that respondent would no longer permit petitioner to see the child. *Id.* ¶ 9. Petitioner states that respondent had previously taken the child to the United States approximately six times with petitioner's knowledge, and that petitioner did not object to these trips as he wanted the child to form relationships with her maternal aunts, cousins and grandparents who reside here. *Id.* ¶¶ 9-10. However, petitioner did not agree to the child's permanent relocation to another country, and the child's recent removal to the United States was effected without his knowledge or consent. *Id.* ¶ 10.

On December 15, 2006, petitioner contacted the London police and explained that he believed that his daughter had been abducted by her mother. *Id.* ¶ 11. Detective Constable Rebecca Glenn of the International Child Abduction Unit explained to

petitioner that under United Kingdom law, child abduction occurs when a child is absent for at least 28 days, which at that point had not yet elapsed. *Id.*

On January 20, 2007, the same neighbor at the Craignish Avenue apartment informed petitioner that he could hear movement in petitioner's apartment, which was above the neighbor's apartment, and that he thought respondent had returned from the United States. *Id.* ¶ 12. Petitioner called the apartment immediately and spoke to respondent, who said that she had left the child in the United States with respondent's sister because respondent was ill and could not care for the child in her condition. *Id.* Respondent told petitioner that she would bring the child back to the United Kingdom when respondent recovered. *Id.*

Petitioner informed Detective Constable Glenn of respondent's return and the child's continued abduction, and Detective Glenn contacted respondent. *Id.* ¶ 13. During the course of their conversation, Detective Glenn informed respondent that, under United Kingdom law, it is considered criminal abduction to remove a child from his or her residence for more than twenty-eight days without the consent of the other parent. Detective Glenn later advised petitioner that should respondent return to the United Kingdom, she will be arrested. *Id.*

Petitioner states that between January and February of 2007, he believed Detective Glenn was pursuing the abduction case, and that he was surprised to learn in late February that she had done nothing. *Id.* ¶ 14. Following an unfruitful meeting with Detective Glenn on February 24, 2007, petitioner sought legal assistance. *Id.* While searching for a solicitor competent in child abduction matters, petitioner states that ReUnite[2] contacted him and advised him to complete a Hague Convention Application. *Id.* ¶ 16. Petitioner compiled the requisite supporting documents and submitted his Hague Convention application on May 17, 2007. *Id.* ¶ 18; *see also* Pieper Decl. Ex. D (copy of petitioner's Hague Convention application).

Petitioner has concluded and I so find that respondent does not intend to return the child to the United Kingdom voluntarily. *Id.* ¶ 21. Respondent has withdrawn all of her savings in the United Kingdom, has many unpaid bills, and several money judgments against her and petitioner's real property in London. *Id.* Petitioner states and I find that in May of 2008, respondent entered the United Kingdom and withdrew the child's benefit money from a joint account held with petitioner and closed the account. *Id.* The International Child Abduction Unit is currently investigating whether respondent used a passport bearing a false

---

[2] "ReUnite" appears to be "the leading UK charity specialising in international parental child abduction." *See* http://www.reunite.org/ (last visited Oct. 30, 2008).

name to travel because of the outstanding warrant for her arrest in the United Kingdom for child abduction. *Id.*

From mid-December of 2006 until the present, petitioner states that he has attempted to call the child at least once a week. *Id.* ¶ 25. However, the telephone numbers he has used have been frequently changed without notice to him, and the child was moved several times. *Id.* On several occasions, petitioner called a number where he believed the child was residing, only to have the person on the other end of the line say "wrong number" and hang up. *Id.* Until October 22, 2008, however, petitioner states that he has been able to speak with the child over the phone on a weekly or fortnightly basis. *Id.* ¶ 26. In the past, the child informed petitioner that respondent's sisters had instructed the child not to pick up the telephone when it rang. However, the child has still on occasion answered the telephone. *Id.*

## DISCUSSION

The Hague Convention entered into force in the United States on July 1, 1988, for the purpose of "protect[ing] children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, Preamble; 53 Fed. Reg. 23843. On the date that Congress adopted

the Convention, it also passed ICARA to implement the multilateral treaty.  42 U.S.C. § 11601 *et seq.;* 53 Fed. Reg. 23843.  The Hague Convention is specifically designed to prevent the removal or retention of children by close family members. "To deter family members from removing children to jurisdictions more favorable to their custody claims in order to obtain a right of custody from the authorities of the country to which the child has been taken, the Hague Convention attempts to deprive [their] actions of any practical or juridical consequences." *Gitter v. Gitter*, 396 F.3d 124, 129-30 (2d Cir. 2005) (internal quotations omitted).  The Hague Convention adopts the principle that the child's country of "habitual residence" is "best placed to decide upon questions of custody and access." *Croll v. Croll*, 229 F.3d 133, 137 (2d Cir. 2000) (internal quotations omitted).  Both the United States and the United Kingdom are signatories to the Hague Convention.  53 Fed. Reg. 23843.

The scope of a court's inquiry under the Hague Convention is limited to the merits of the abduction claim.  ICARA specifically provides that the Convention and its implementation "empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims."  42 U.S.C. § 11601(b)(4).  These principles of the Convention have long been "embraced by unanimous federal authority." *Friedrich v. Friedrich*, 78 F.3d 1060, 1063-64 (6th

Cir. 1996) (citing *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995); *Feder v. Evans-Feder*, 63 F.3d 217, 221 (3d Cir. 1995); *Journe v. Journe*, 911 F. Supp. 43 (D.P.R. 1995)); *see also* *Giampaolo v. Erneta*, 390 F. Supp. 2d 1269, 1275-76 (N.D. Ga. 2004); *Morris v. Morris*, 55 F. Supp. 2d 1156, 1160 (D. Colo. 1999) (recognizing that "[p]ursuant to Article 19 of the Convention, [this Court has] no power to pass on the merits of custody"); *Currier v. Currier*, 845 F. Supp. 916 (D.N.H. 1994); *Friedrich v. Friedrich*, 983 F.2d 1396, 1399 (6th Cir. 1993); *Meredith v. Meredith*, 759 F. Supp. 1432, 1434 (D. Ariz. 1991).

In order to prevail on a claim under the Hague Convention for the return of a child, a petitioner must establish by a preponderance of the evidence that the child was wrongfully removed or retained within the meaning of the Convention. 42 U.S.C. § 11603(e)(1)(A). To establish wrongful removal or retention of a child, petitioner must show: "that (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Gitter*, 396 F.3d at 131; *see also* 42 U.S.C. § 11603(e)(1)(A). If petitioner is successful in establishing these elements by a preponderance of the evidence, the burden then shifts to

respondent to establish that one of the exceptions set forth in the Convention applies.  42 U.S.C. § 11603(e)(2).

1.    *Removal from Habitual Residence*

First, petitioner must show that respondent's removal of the child from the United Kingdom to or retention in the United States constituted removal from or retention of the child outside the State in which she was "habitually resident."  The Hague Convention does not itself provide any definition of "habitually resident."  However, the Second Circuit has held that analysis of a child's habitual residence begins with consideration of the relevant intentions, normally "the intent of the child's parents or others who may fix the child's residence." *Gitter v. Gitter*, 396 F.3d 124, 131-32 (2d Cir. 2005).  Where the parents disagree as to the place they intended to be the child's habitual residence, it is the court's task to determine the intentions of the parents as of the last time that their intentions were shared.  *Id.* at 133.

Parental intent alone cannot establish the child's habitual residence, however; courts must also inquire whether the available evidence "unequivocally points to the conclusion that the child has acclimatized to [a] new location and thus has acquired a new habitual residence" notwithstanding the parents' intentions.  *Id.* at 134.  To determine if a child has acclimatized to her new location, courts "must consider if

requiring return to the original forum would now be tantamount to taking the child out of the family and social environment in which its life has developed.  Only in relatively rare circumstances will the child's acclimatization to a new location be so complete that serious harm to the child can be expected to result from compelling [her] return to the family's intended residence." *Daunis v. Daunis*, 222 Fed. Appx. 32, 34 (2d Cir. 2007) (internal citations and quotation marks omitted). Therefore, "courts should be 'slow to infer' that the child's acclimatization trumps the parents' shared intent." *Gitter*, 396 F.3d at 134 (citing *Mozes v. Mozes*, 239 F.3d 1067, 1079 (9th Cir. 2001)).

The available evidence shows that the child was habitually resident in the United Kingdom before her removal to the United States.  By living together with the child in London from the time of the child's birth until July of 2006, petitioner and respondent demonstrated their mutual intent that the child's habitual residence be the United Kingdom.  Following petitioner and respondent's separation in July of 2006, petitioner and respondent mutually agreed that the child would remain in England, staying with petitioner on weekends and with respondent during the week.  This arrangement demonstrates continued mutual intent that the child reside in the United Kingdom.  Thereafter, sometime in late 2006, respondent took the child from the United

Kingdom to the United States, where both respondent and the child have since spent the majority of their time. Sometime in late 2006, respondent may have intended to change the child's habitual residence from the United Kingdom to the United States, despite respondent's statement to petitioner that she intended to bring the child back to the United Kingdom when respondent's health improved. Petitioner states in his affidavit and testified at the evidentiary hearing that he never agreed to the child's permanent relocation to another country, and that the child's removal to the United States was effected without his knowledge or consent. Transcript of November 12, 2008 Hearing ("Tr.") at 20-21. Further, petitioner has submitted records demonstrating that at least as of early 2007, the child was still a registered patient of a local general practitioner in London, and that she still had a place in a nursery school program there. Lachhman Decl. Exs. B-C. Petitioner's submissions show that even if respondent intended to change the child's habitual residence in late 2006, her intent diverged from petitioner's intent at that time. When petitioner's and respondent's intents last converged, the evidence shows that they intended the child's habitual residence to be the United Kingdom.

Nor is there evidence "unequivocally point[ing] to the conclusion" that the child has acclimatized to her new location in the United States, notwithstanding her parents' intentions.

At most, the child has spent the better part of two years in the United States since her removal from the United Kingdom. *See Aguirre v. Calle*, No. 08 CV 2613, 2008 WL 4461931, at *4 (E.D.N.Y. Oct. 3, 2008) (finding no evidence that child had acclimatized to United States despite her presence there for over one year); *c.f. Gitter*, 396 F.3d at 133 (noting that the Second Circuit would be "hard pressed to conclude . . . that a child who has spent fifteen years abroad in the same State is not habitually resident there").  Petitioner has maintained telephone contact with the child, and the child has demonstrated a desire to maintain contact with petitioner despite instructions from respondent's family not to answer his phone calls.  In addition, the child appears to have been moved to several different locations in the United States at various times, and has on occasion left the United States with respondent.  Under these circumstances, the evidence does not unequivocally demonstrate that the child has acclimatized to her new location.  Accordingly, petitioner has established that the child was removed from or retained outside her habitual residence when respondent took her from the United Kingdom to the United States.

2.   *Removal in Breach of Petitioner's Custody Rights*

The next element petitioner must establish is that respondent's removal of the child was "in breach of rights of custody attributed to a person . . . under the law of the State

in which the child was habitually resident immediately before the removal." Hague Convention, Art. 3(a). Petitioner must first establish that he in fact possesses custody rights to the child under English law. Under the Hague Convention, a court "may take notice directly of the law of . . . the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law." Hague Convention, Art. 14.

Petitioner claims custody rights under English law pursuant to Section 2 of the United Kingdom Children Act of 1989 (the "Children Act"). *See* Pieper Decl. Ex. F (copy of Section 2 of the Children Act). Under Section 2 of the Children Act, "[w]here a child's father and mother were married to each other at the time of his [or her] birth, they shall each have parental responsibility for the child." Children Act, ch. 41, Part I, § 2(1). "'Parental responsibility' means all the rights, duties, powers, responsibilities and authority which by law a parent of a child has in relation to the child and his property." *Id.* § 3(1). Under the Hague Convention, "rights of custody" includes "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention Art. 5(a). A plain reading of the definitions of "parental responsibility" and "rights of custody" leads to the conclusion that the former includes the latter.

Accordingly, assuming that petitioner and respondent were validly married at the time of the child's birth, I conclude that for the purposes of the Hague Convention, petitioner has established that he has on-going *de jure* custody of the child under English law until a court of competent jurisdiction orders otherwise. This conclusion is supported by the conclusions of other American courts. *See, e.g.*, *Morgan v. Morgan*, 289 F. Supp. 2d 1067, 1069 (N.D. Iowa 2003) (finding that showing of parental responsibility under Section 2 of Children Act was sufficient to show custody rights under English law for purposes of Hague Convention); *In re Robinson*, 983 F. Supp. 1339, 1342 (D. Colo. 1997) (same).

Respondent, however, submits that petitioner's custody rights argument under Section 2 of the Children Act fails because respondent and petitioner were not validly married at the time of the child's birth. Respondent has not submitted an affidavit to this effect, nor did she testify at the November 12, 2008 hearing. However, upon cross-examination of petitioner, counsel for respondent questioned petitioner concerning two documents purportedly establishing that respondent and petitioner's marriage is invalid due to bigamy. The first of these documents is a record from English family court, in which respondent objects to paying the costs of divorce proceedings on the grounds that the marriage is "void for bigamy." Resp't Hr'g Ex. 2. The second is a decree from a Guyanese court dated June 29, 1999,

making "absolute" a May 17, 1999 decree that the marriage between respondent and her previous husband was dissolved. Resp't Hr'g Ex. 3. At the evidentiary hearing, petitioner testified in explanation of these documents that at some time in 2006, he had learned of the possibility that respondent's earlier marriage might not have been dissolved prior to his marriage to respondent on June 20, 1999, and that on the advice of counsel, he had raised the defense of bigamy in opposition to divorce proceedings instituted by respondent. Tr. at 11, 27-28, 33. Petitioner also testified that an investigation was launched into the validity of his marriage to petitioner, but that no determination was made that the marriage was void under English law, Tr. at 11, 33, and that the divorce proceedings were ultimately abandoned by respondent. Tr. at 14-15.

The gravamen of respondent's argument is that the marriage between respondent and petitioner is void for bigamy, or that judicial estoppel should bar petitioner from asserting that his marriage to respondent is valid because he previously maintained that it was void for bigamy in a prior proceeding. With regard to respondent's first argument, respondent has not persuaded me that petitioner's and respondent's marriage is void for bigamy. The Guyanese decree of dissolution of respondent's prior marriage was issued on May 17, 1999, prior to respondent's marriage to petitioner; on its face, the June 29, 1999 Guyanese decree merely

makes "absolute" the May 17, 1999 decree of dissolution.  Despite
testimony by petitioner that English authorities investigated the
validity of respondent's marriage to petitioner, respondent has
offered no evidence that any English authority ever determined
that the marriage was void.  Accordingly, I conclude that
respondent has not established that her marriage to petitioner is
void under English law.

Respondent's judicial estoppel argument is equally
unavailing.  "A party invoking judicial estoppel must show that
(1) the party against whom the estoppel is asserted took an
inconsistent position in a prior proceeding and (2) that position
was adopted by the first tribunal in some manner . . . such as by
rendering a favorable judgment[.]"  *Mitchell v. Washingtonville
Cent. School Dist.*, 190 F.3d 1, 6 (2d Cir. 1999) (internal
citations omitted).  Here, respondent has offered documentary
evidence sufficient to show that petitioner took an inconsistent
position in a prior proceeding by raising the defense of bigamy
in an English court.  Resp't Hr'g Ex. 2.  However, respondent has
offered no proof that any English court or other authority ever
"adopted" petitioner's prior position.  Accordingly, petitioner
is not judicially estopped from maintaining that his marriage to
petitioner is valid in this proceeding.[3]

---

[3] I further note that petitioner's prior inconsistent position may have
been the result of good faith error, in which case the Second Circuit has
recognized that the doctrine of judicial estoppel does not apply.  *See Simon
v. Safelite Glass Corp.*, 128 F.3d 68, 71, 73 (2d Cir. 1997).  At the

Even if respondent's arguments were successful, petitioner
contends that he still would retain custody rights over the child
under English law.  Petitioner concedes that Section 2(2)(a) of
the Children Act provides that "[w]here a child's father and
mother were not married to each other at the time of his birth .
. . the mother shall have parental responsibility of the child."
However, petitioner urges that this statement must be read in
conjunction with Section 2(3) of the Children Act, which states
that "[r]eferences in this Act to a child whose father and mother
were or, (as the case may be) were not, married to each other at
the time of his birth must be read with section 1 of the . . .
Family Law Reform Act 1987 (which extends their meaning)."
Section 1 of England's Family Law Reform Act of 1987 (the "Family
Law Reform Act") states that "references to a person whose father
and mother were not married to each other at the time of his
birth do not include . . . references to any person . . . who . .
. is treated as legitimate by virtue of section 1 of the
Legitimacy Act 1976."  Family Law Reform Act §§ 1(2)(b), 1(3)(a),
attached as Ex. A to the letter brief of Kristina L. Pieper dated
November 18, 2008 (the "Nov. 18 Pieper Letter").  In turn,

_____

evidentiary hearing, petitioner testified that he and his counsel in London
came to believe that his marriage to respondent might be bigamist in 2006, and
that upon the advice of counsel, petitioner raised this defense in an English
court.  Tr. at 27-28, 33.  However, petitioner testified that he never
received proof that the marriage was invalid, and that no English court ever
addressed the issue.  Tr. at 33.  As of the date of the hearing, petitioner
testified that he believed his marriage to respondent was valid, Tr. at 34,
and I conclude that petitioner's prior position may have been the result of
good faith error.

England's Legitimacy Act of 1976 (the "Legitimacy Act") states
that "[t]he child of a void marriage, whenever born, shall be
treated as the legitimate child of his parents if at the time of
. . . the insemination resulting in the birth . . . both or
either of the parties reasonably believed that the marriage was
valid."  Legitimacy Act § 1(1), attached as Ex. B to the Nov. 18
Pieper Letter.  In other words, if one or both of respondent and
petitioner reasonably believed that their marriage was valid at
the time of the child's birth, petitioner has custody rights over
the child under English law.

Here, petitioner has repeatedly stated both in his affidavit
and at the evidentiary hearing that he currently believes his
marriage to be valid.  Further, petitioner testified at the
hearing that he did not come to believe that his marriage might
be void until some time in 2006.  Tr. at 33.  There is no
evidence of any reason petitioner should not have reasonably
believed his marriage to have been valid in 2003, when the child
was born.  I find that petitioner has established by a
preponderance of the evidence that he reasonably believed his
marriage to respondent to be valid when the child was born.

Having established that he has custody rights over the
child, petitioner must next establish by a preponderance of the
evidence that the child was removed in breach of those custody
rights.  Petitioner claims that respondent violated the English

Child Abduction Act of 1984 (the "Abduction Act") when she removed the child to the United States. *See* Pieper Decl. Ex. G (copy of Abduction Act). The Abduction Act provides that it is a criminal offense for a parent to take a child out of the United Kingdom for more than one month without the consent of the other parent, absent court order in favor of the first parent. Abduction Act, ch. 37, Part I. The available evidence shows that respondent took the child from the United Kingdom to the United States for more than one month without the child's father's consent. Accordingly, I conclude that petitioner has established that the child was removed from the United Kingdom in breach of his custody rights.

*3. Petitioner's Exercise of Custody Rights*

The third element that petitioner must establish is that at the time of the child's removal, he was actually exercising his custody rights, or would have been exercising them but for the child's removal. *See* Hague Convention, Art. 3(b) (in order for removal of child to qualify as "wrongful" under Hague Convention, person whose custody rights were breached by removal must show either that he actually exercised those rights at time of removal, or that he would have exercised his rights but for removal).

Petitioner claims that he was actually exercising custody rights or would have been exercising them but for the child's

removal in that as the father of the child, he has cared for her since her birth. Until his separation from respondent, petitioner cared "for the person of the child" on a daily basis. *See* Hague Convention, Art. 5(a) ("rights of custody" relate to "care of the person of the child"). Thereafter, petitioner cared for the child's person on weekends, and maintained telephone contact with the child during the week. By definition, at the time respondent removed the child to the United States, petitioner was not caring "for the person of the child" such that he was actually exercising custody rights within the meaning of the Hague Convention. However, given the evidence of petitioner's past care for the child, it is reasonable to conclude that petitioner would have continued to care for the child's person but for her removal. Therefore, I conclude that petitioner has established that he would have been exercising custody rights within the meaning of the Hague Convention at the time the child was removed from the United Kingdom, but for the child's removal.

*4.    Respondent's Defenses*

Once a petitioner has established that the removal of the child was in violation of his custody rights which he was or would have been exercising, the court must order the child's return to the country of habitual residence unless the respondent can demonstrate that an exception applies. *Blondin v. Dubois*,

189 F.3d 240, 245 (2d Cir. 1999).  Defenses to removal under the Hague Convention are to be interpreted narrowly.  *Id.* at 246; *see also* 42 U.S.C. § 11601(a)(4).

Respondent submits that two defenses to removal apply in this case.  First, respondent argues that this Court need not order the return of the child to the United Kingdom because of her father's alleged history of domestic violence.  Article 13(b) of the Hague Convention provides that if a respondent establishes by clear and convincing evidence a grave risk that the child's return would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," the court is "not bound to order the return of the child."  Hague Convention Art. 13; *see also* 42 U.S.C. § 11603(e)(2)(A); *Blondin v. Dubois*, 78 F. Supp. 2d 283 (S.D.N.Y. 2000), *aff'd* 238 F.3d 153 (2d Cir. 2001) (holding that children need not be returned to France in light of clear and convincing evidence that their return to site of father's past violent abuse exposed children to grave risk of physical or psychological harm).  Respondent argues that because petitioner admitted at the evidentiary hearing that he had been arrested on domestic violence charges in the past, Tr. at 29-30, respondent has met her burden of proving a grave risk of harm to the child should the child be returned to the United Kingdom.  However, I cannot conclude that petitioner's admissions constitute clear and convincing evidence of such a

risk, especially where there is no evidence that petitioner ever harmed the child and where petitioner testified that an English court determined that he was not guilty of physical abuse. Tr. at 14. Accordingly, respondent's argument fails as it relates to this exception.

Second, respondent argues that I need not order the return of the child because the child is well settled in her new environment in the United States. Article 12 of the Hague Convention provides that where proceedings have been commenced more than one year after the date of wrongful removal or retention, a court shall order the return of the child "unless it is demonstrated that the child is now settled in its new environment." Hague Convention, Art. 12. ICARA provides that a respondent must prove that the child is settled in its new environment by a preponderance of the evidence in order for this exception to apply. 42 U.S.C. § 11603(e)(2)(B). Having already determined that the available evidence does not unequivocally point to the conclusion that the child has acclimatized to her new location in the United States, *see supra*, neither do I find that respondent has established by a preponderance of the evidence that the child is settled in the United States. Other than conclusory statements in her brief, *see* Respondent's Post-Hearing Memorandum In Opposition at 8, respondent has not offered any evidence showing that the child is settled in her new

environment. Accordingly, this defense to removal is not available to respondent.

### CONCLUSION

For the reasons set forth above, judgment is rendered in favor of petitioner. Accordingly, and as set forth in the accompanying order, the child shall be returned to the United Kingdom. The clerk is directed to transmit a filed copy of the within to all parties and the magistrate judge.

SO ORDERED.

Dated :    Brooklyn, New York
           November 20, 2008

                    By: /s/ Charles P. Sifton (electronically signed)
                        United States District Judge